## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Robert B.,

        Plaintiff,

v.

Martin J. O'Malley, Commissioner
of Social Security Administration,

        Defendant.

Case No. 22-cv-2093 (ECT/ECW)

**REPORT AND RECOMMENDATION**

This matter is before the Court on Plaintiff Robert B.'s ("Plaintiff") Complaint seeking judicial review of a final decision by the Commissioner denying his application for disability insurance benefits. (*See generally*, Dkt. 1.) The parties have filed briefs "present[ing] for decision" Plaintiff's request for judicial review of the final decision of the Commissioner of Social Security ("the Commissioner").[1] (*See* Dkts. 20, 26, 27.) This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons stated below, the Court recommends that Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 20) be denied and the Commissioner's request that the Court affirm the Commissioner's decision (Dkt. 25) be granted.

---

[1]    As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

# I.    PROCEDURAL BACKGROUND

On March 31, 2016, Plaintiff applied for Disability Insurance under Title II of the Social Security Act ("the Act"), initially alleging disability as of October 14, 2015, but later amending the alleged disability date to May 1, 2017.  (R. 142, 265, 280.)[2]  His application was denied initially and on reconsideration.  (R. 142-56, 174-87.)

Plaintiff requested a hearing, and on April 2, 2019, Plaintiff appeared for a hearing before Administrative Law Judge Micah Pharris ("the ALJ").  (R. 204-05, *see* R. 73-141 (transcript).)  The ALJ issued an unfavorable decision on April 16, 2019, finding Plaintiff was not disabled.  (R. 29-62.)  Plaintiff sought judicial review of the decision and on March 11, 2021, Senior U.S. District Judge Marcia S. Krieger reversed and remanded the case.  (R. 750-73.)  Plaintiff appeared for a remand hearing before the ALJ on April 14, 2022.  (R. 663-702.)  The ALJ called a medical expert ("ME"), James Wargel, Ph.D., and a vocational expert ("VE"), Michael Stern, as witnesses.  (R. 664.)  The ALJ issued a decision finding Plaintiff disabled and awarding benefits as of August 27, 2020 ("established onset date"), but found Plaintiff was not disabled from Plaintiff's amended alleged disability date of May 1, 2017 to the August 27, 2020 date.  (R. 605, 639.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a),[3] the ALJ first determined at step one that Plaintiff had not engaged in

---

[2]    The Social Security Administrative Record ("R.") is available at Dkt. 13.

[3]    The Eighth Circuit described this five-step process that the Commissioner of Social Security must use as follows:

substantial gainful activity since May 1, 2017, the amended alleged onset date of disability.  (R. 607.)

At step two, the ALJ determined that since the amended alleged onset date of disability, May 1, 2017, Plaintiff had the following severe impairments: multiple sclerosis ("MS"); MS-related cognitive disorder; cervical degenerative disc disease; major depressive disorder; and anxiety.  (R. 607.)  The ALJ acknowledged that Plaintiff was diagnosed with left carpal tunnel syndrome in 2022 but stated that Plaintiff "was not diagnosed at the time of the established onset date, and therefore [this] was not a medically determinable impairment beginning at the amended alleged onset date, through the established onset date of disability."  (R. 607.)

At step three, the ALJ found that before August 27, 2020, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 608.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

---

(1) whether the claimant is currently engaged in a substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limit the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's [residual functional capacity ("RFC")] is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

[P]rior to August 27, 2020, the claimant had the residual functional capacity to perform light work, except: the claimant may never climb ropes, ladders, or scaffolds; and may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. The claimant may have no exposure to extreme heat, unprotected heights, or hazards. The claimant is limited to simple, routine, repetitive tasks at a nonproduction pace. The tasks should not be variable throughout the day but should be routine in nature. Due to processing speed limitations, the individual would be limited to tasks involving predominantly the taking of directions and not collaborative decision making or making recommendations to customers though he may work in the company of coworkers and the public. In terms of production pace, I mean a job that is done at a moving line, where the pace of work is controlled completely exclusively to the worker, in other words a moving line, where the rate of work is controlled hour-to-hour and minute-to-minute, so jobs with daily quotas would be fine, where the pace of work could vary throughout the day as long as the daily quotas are met, whereas a job with hour-to-hour or minute-to-minute quotas would not be fine. (20 CFR 404.1567)

(R. 615, 633.)  The ALJ found that since May 1, 2017, Plaintiff was unable to perform his past relevant work as an attorney.  (R. 633.)

However, at step five, the ALJ found that prior to August 27, 2020, Plaintiff would have been able to perform the requirements of "representative unskilled," "light occupations" such as: Merchandise Marker, Dictionary of Occupational Titles ("DOT") 209.587-034; Collator Operator DOT 208.685-010; and Router DOT 222.587-038.  (R. 634-45.)

The ALJ concluded that beginning on August 27, 2020, the severity of Plaintiff's impairments "met the criteria of section 12.02 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 404.1525)," (R. 635) and that Plaintiff "was not disabled prior to August 27, 2020, but he became disabled on that date and has continued to be

4

disabled through the date of this decision[, April 27, 2022] (20 CFR 404.1520(g))" (R. 638).

The ALJ's decision became the final decision of the Commissioner after remand, 20 C.F.R. § 404.984(a), and Plaintiff commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will briefly summarize Plaintiff's MS treatment and evaluations and incorporate the record into the Discussion (Section V) to the extent necessary to explain its reasoning.

## II.    MS TREATMENT AND EVALUATIONS

Plaintiff was diagnosed with relapsing-remitting MS[4] in 1991 when he developed partial paralysis and numbness of the left side of his body. (R. 382.) Plaintiff worked as an attorney for Best Buy from April 1998 to October 2015, when he felt that he was no longer capable of the "high level of precision and the speed" that his job required. (R. 286, 518.)

Plaintiff saw Jeanne L. Beattie, MD, in 2014 for his MS, who noted that his most recent flare-up had been in the spring of 2012. (R. 387-88.)

Plaintiff began seeing Syed Shahkhan, MD, in May 2015 for treatment of his MS. (R. 415-16.) Plaintiff saw Dr. Shahkhan regularly with visits in June 2015, September

---

[4]    "Relapsing-remitting MS is marked by relapses that last at least 24 hours. During a relapse, symptoms get worse. A relapse will be followed by a remission. During a remission, symptoms partly or completely go away." https://www.hopkinsmedicine.org/health/conditions-and-diseases/multiple-sclerosis-ms/relapsing-remitting-multiple-sclerosis (last visited Jan. 31, 2024).

2015, October 2015, January 2016, April 2017, March 2018, September 2018, June 2019, and January 2020, with visits and testing continuing into 2022.  (R. 405, R. 406, R. 411-12, R. 414-16, R. 524-25, R. 529-30, R. 584, R. 1130-131, R. 1150-151; *see also, e.g.*, R. 1068-70 (2022 visit).)  Dr. Shahkhan completed a Treating Physician Statement in August 2019 for Appeals Council Review in this case in which he opined that Plaintiff had been unable to work since at least May 1, 2017.  (R. 1054-57.)  He opined that Plaintiff "would require accommodations, such as extra breaks, to continuously stay on task at even simple, unskilled work for entire 8 hour workdays."  (R. 1056.)  Dr. Shahkhan also opined that Plaintiff would need extra breaks due to attention deficits if he were "to attempt even simple, relatively unskilled work," specifically "[e]xtra breaks every 1/2 an hour to 45 minutes."  (R. 1057.)

Between 2015 and the established onset date, Plaintiff was evaluated by neuropsychologist Kerri L. Lamberty, Ph.D., three times, first in September 2015 (R. 382-86), second in March 2017 (R. 518-20), and third in August 2020 (R. 1106-11.)  Because Plaintiff challenges the weight the ALJ assigned to Dr. Lamberty's 2017 opinion, the Court describes the 2015 and 2017 evaluations and testing below.

Dr. Lamberty's 2015 report states that the neuropsychological evaluation was requested "to assess [Plaintiff's] current cognitive and emotional status" because he had "been struggling recently to complete work accurately and has made some costly mistakes."  (R. 382.)  Plaintiff's most recent MRI showed "stable multiple foci of supratentorial white matter signal abnormality with no evidence for interval progression of disease."  (R. 382.)  Plaintiff arrived on time for his appointment, was appropriately

dressed and groomed, displayed a full range of affect and mood, and appeared mildly anxious about his recent difficulties at work. (R. 382-83.) Although his attention was variable and his response speed was slower than average, he was pleasant and cooperative throughout the evaluation and understood task instructions, putting forth "good effort" on testing. (R. 382-83.)

The 2015 testing results were as follows. Plaintiff's performance on the Wide Range of Achievement Test-3 ("WRAT-3") was in the average range. (R. 383.) Plaintiff's scores on the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") subtests were "variable" with poor performance on tests requiring rapid responses, and his "perceptual speed was significantly slowed," but he obtained a prorated Verbal Comprehension index of 122, a prorated Perceptual Reasoning Index of 105, a working memory index of 83, and a perceptual speed index of 74, with full scale IQ of 99.[5] (R. 383.) Dr. Lamberty estimated that Plaintiff's "pre-morbid" IQ and cognitive functioning were in the high average to superior range while working as an attorney, but as of 2015, Plaintiff's IQ and cognitive functioning had "decline[d]" to average. (R. 383-85.)

Plaintiff was "fully oriented and able to complete simple, rote tasks as well as more complex tasks requiring working memory." (R. 383.) Information processing and divided attention were moderately impaired; oral arithmetic skills were in the average to

---

[5]    Each of these indexes has a mean of 100. https://arizonaforensics.com/wechsler-adult-intelligence-scale-iv-wais-iv/ (last visited Jan. 31, 2024); https://www.washingtoncenterforcognitivetherapy.com/wp-content/uploads/2015/01/greenwood_description-wais-1.pdf (last visited Jan. 31, 2024). An IQ of 90-109 is the range of the average adult, with about two-thirds of all adults tested obtaining IQ scores between 85 and 115. *Id.*

low average span, while digit span, visual motor coding speed, simple visual sequencing were in the low average range. (R. 383.) Plaintiff had very significant attention difficulties, and his performance was generally characterized as "slow and inaccurate, and the pattern is generally a strong indicator of attention related deficits." (R. 384.) "Even when responding very slowly, he was not able to increase his accuracy." (R. 384.)

As for Plaintiff's 2015 executive functioning and memory functioning, certain aspects of his executive functioning were high average or average, while other aspects were low average. (R. 384.) His memory functioning was average to high average. (R. 384.) As to visuospatial functioning, he had significant difficulty organizing information on an unstructured task and took almost double the average time to complete it, although his performance on a structured task was high average. (R. 384.)

Dr. Lamberty summarized Plaintiff's 2015 results as "indicative of mild executive dysfunction and moderate attention difficulties and psychomotor slowing," with significantly impaired attention, slow response speed, and "great difficulty" with unstructured tasks requiring executive functioning. (R. 385.) His memory was "essentially within normal limits" and performance on language tasks was normal. (R. 385.) She diagnosed Plaintiff with "Cognitive disorder, [not otherwise specified] secondary to multiple sclerosis" and anxiety, not otherwise specified. (R. 385.)

Dr. Lamberty examined Plaintiff again on March 21, 2017. (R. 518-20.) Plaintiff reported to Dr. Lamberty that "cognitively and physically, his symptoms have been relatively stable." (R. 518.) Dr. Lamberty noted that the most recent MRI of Plaintiff's head "showed stable mild to moderate supratentorial white matter changes compatible

with multiple, chronic demyelinating plaques.  There was also a stable, mild atrophy and mild T1 hypointense lesion load." (R. 518.)

Plaintiff's 2017 test results were as follows: on the perceptual reasoning index 105 (same from 2015), the working memory index 97 (up from 83 in 2015), and the perceptual speed index 81 (up from 74 in 2015).  (R. 519.)  Plaintiff's scores "continue[d] to reflect issues with information processing speed and working memory," with mildly impaired performance in a symbol search task and low average performance for simple visual sequencing, digit span, and rapid color naming/word reading.  (R. 519.)  Plaintiff's 2017 prose memory functioning was in the above average to high average range; his performance on a "word list learning task" was in the "low average range for immediate recall" but in the average range after a brief delay; "recognition memory was good" but "below expectation"; and his visual retention of information was poor.  (R. 519.)

Plaintiff's verbal skills in 2017 were generally in the high to high average range with normal visuospatial skills.  (R. 519.)  His executive functioning as to nonverbal matrix reasoning was in the high average range and he was average for visuospatial reasoning, mental flexibility/set shifting, and novel problem-solving.  (R. 519.)  He scored in the low average range for complex hypothesis testing and his phonemic fluency was in the low average to mildly impaired range.  (R. 519.)  Plaintiff's verbal skills remained in the average to high average range with visuospatial skills "within normal limits." (R. 519.)

Dr. Lamberty compared Plaintiff's 2017 results to his 2015 results, concluding:

> [H]e has had further decline in cognitive functioning. He exhibits slow information processing speed and issues with attention. In addition, he is beginning to exhibit some executive issues which were noted on testing and in his interpersonal interactions. As for memory, while his scores are lower, scores are technically within normal limits.

(R. 520.)  She concluded by assessing Plaintiff with "Mild neurocognitive disorder secondary to Multiple sclerosis."  (R. 520.)

Several weeks later, on May 1, 2017, Dr. Lamberty completed a Behavioral Functional Ability questionnaire for Plaintiff, which was faxed to Plaintiff's insurance company.  (R. 521-23.)  Dr. Lamberty assessed Plaintiff with moderate, marked, and extreme limitations on all twelve categories, where "moderate" meant "[t]here is more than a slight limitation in this area, but the individual is still able to function satisfactorily"; "marked" meant "[t]here is serious limitation in this area" and "a substantial loss in the ability to effectively function"; and "extreme" meant "[t]here is major limitation in this area" and "no useful ability to function in this area."  (R. 521-23.) She assigned Plaintiff "moderate" limitations in: performing repetitive or short-cycled work; working alone or apart in physical isolation from others; working under specific instructions; dealing with people; and reliability/consistency.  (R. 521-23.)  Dr. Lamberty assigned Plaintiff "marked" limitations in: directing, controlling, or planning activities of others; influencing people in their opinions, attitudes, and judgments; performing a variety of duties; expressing personal feelings; and making judgments and decisions.  (R. 521-23.)  She assigned Plaintiff "extreme" limitations in performing under stress and attaining precise set limits, tolerances, and standards.  (R. 521-23.)  Finally, Dr. Lamberty opined that Plaintiff was "not currently able to work for any period of time."  (R. 523.)

Plaintiff had an initial assessment for physical therapy on September 2, 2016, where the primary reason for the therapy was a limp in his walk that began in 1994. (R. 469-75.) He continued with physical therapy until discharged on December 14, 2016. (R. 476-506.)

In August 2016, licensed psychologist Mark Schuler, Ph.D., conducted a disability determination evaluation, including cognitive testing, of Plaintiff. (R. 455-68.) Dr. Schuler assessed Plaintiff with mild neurocognitive disorder due to another medical condition and adjustment disorder with anxious mood. (R. 455.) His WAIS-IV score was 104, "which fell at the 61st percentile and within the average range." (R. 460.) His greatest difficulty was in processing speed and he had a significant split between verbal and nonverbal/perceptual abilities. (R. 460.) His immediate and delayed memory functioning were in the "low average range." (R. 460.) His WAIS-VI working and visual memory scores were in the average range, although his visual score was in the "lower end of the average range." (R. 460.) Other attention scores were in the low average or average range, and his processing speed and flexibility scores were in the low average range. (R. 460-61.) Verbal reasoning and memory and visual memory fell in the low average, average, above average, and superior ranges, except for immediate recall for contextually based verbal information, which was mildly impaired. (R. 461-62.) Plaintiff's executive functioning scores were above average or superior. (R. 462.) Dr. Schuler did note a significant difference between Plaintiff's verbal and nonverbal scores and a decline in verbal memory and current memory scores (from average to low average) from the 2015 test results. (R. 462-63.) In a Medical Sources Statement

included in the evaluation, Dr. Schuler assessed Plaintiff with "mild" limitations in ability to understand, remember, and follow instructions; capacity to sustain attention and concentration; and ability to perform simple repetitive clerical tasks; and "moderate" limitations in multitasking in complex situations. (R. 465.) He noted that "[i]t would be important to consult with his physicians regarding barriers to his ability to persist at a competitive work pace" and that mild limitations in coping with an entry-level workplace would be expected. (R. 465.)

Plaintiff's MS was also discussed during visits with his primary care provider, Gregory M. Dukinfield, M.D., on February 15, 2017 (R. 546-50) and on March 23, 2018 (R. 554-57).

### III.   MEDICAL EXPERT'S TESTIMONY

The ALJ requested ME James Wargel's testimony at the hearing to comply with the remand order. (R. 665, 673, 677.) In response to the ALJ's questioning, the ME testified as follows as to Plaintiff's functioning from 2015 to the established onset date in August 2020:

> A Well, I think you've already indicated that part of the dilemma in this case is, that even though the person may not be able to have all of his prior functioning, many areas of his current functioning are still very high. And that was especially true in the early neuropsychs. I would refer to the one in 2[0]13, which is 12F. I know it's before the time in question, but it helps us to establish a baseline. Then there is 1F, which is in 2[0]15, September. And there is 5F which is in August of 2[0]16. Then there is 9F, which was in March of 2[0]17.
>
> Q Right.
>
> A So, we have to be aware that he still, during those early neuropsychologicals, comes across a person with significantly well

preserved global intellectual functioning. There may be particular areas that are becoming more problematic as time goes on, but the global picture is still well retained. In addition to that, we could identify particular kinds of situations, in which he would crash and burn. We could probably also identify particular kinds of situations in which he would do just fine. So, it's not a universal effect during those early, those first score neuropsychologicals.

Q Okay. And before we get into kind of these crash and burn environments factually, am I understanding you, that you don't believe the listing would be met during this time period?

A Correct. I think there are environments in which he would have still been able to function better, and would, then would be above the listing level.

Q All right. So, let's get into the B Criteria first, and then we'll talk about what kind of limitations there would be during this time. So, what did you think about the B Criteria during that time?

A Under the B Criteria at that time, I would have put B(1) as moderate. B(2) as mild. B(3) as moderate. And B(4) as mild.

Q All right. And what types of limitations would you expect to see in a workplace for somebody with those types of findings to be able to be successful?

A Okay. He has a problem with organization, especially in a disorganized environment. And so, he would need a structured environment. It is clear --

Q Now, that doesn't mean supported, necessarily, but just --

A No, just structured. You know --

Q Okay.

A -- we've all had jobs where they've said, sit down here and do this, and don't do anything else.

Q Okay.

A And that would be one of those. He shouldn't be -- he would do fine with understanding, remembering, and carrying out simple instructions. He probably would do okay with some complex instructions. The goal would be to avoid complex decision-making. Under B(2) he still has high social skills.

Basically, the big impact there would be, I would not put him in a current discussion group that involves problem solving or decision making, with a group of colleagues.

Q Um-hum.

A He can be around them. He can work with them. He shouldn't be interacting with them to reach a particular product. He shouldn't be trying to persuade the public to do anything.

Q Okay. So, it would be more like taking --

A Under B --

Q -- it would be more like taking direction and not like, making decisions or collaboration?

A That's correct.

Q Okay.

A And it has to do with an issue that we'll talk about, which is speed of processing.

Q Okay.

A So, in a conversation, the speed of -- you'd have to keep up, and you have to be able to get out what you think you know quickly. And that's part of the problem. Under B(3), clearly, on a non-timed setting would be best. He's not good if he's expected to do rapid work.

Q Okay.

A No production line.

Q Sure.

A In best of all actual worlds, variable of capacity across a half day or a full day.

Q So, a daily quota would be okay, but not anything that would be incrementalized smaller than that in your view?

A That's right, that's right. If I worked in a machine plant, they said by the end of the day you have to have this done, I said fine.

Q Okay.

A Any day that I wasn't feeling good, I -- you know you fluctuate.

Q Right.

Q So, that would be important. The other kind of situation that would be particularly destructive would be if he had to organize as he went. So, again, that kind of ties back to B(1), structured, relatively clear, no reliance on him to organize things. I would probably keep change in workplace or work duties at a low level.

Q So, not only repetitive, but routine? In other words, these functions would stay -- would be similar throughout the workday?

A Correct. And across time.

Q Okay.

A Now, the other obvious thing there is, the elimination of stress. He is anxious. He does -- he shows anxiety externally at times. He is anxious, not externally a lot of times. He will react to what he sees as decrements in his own performance. It would be nice to have a low-stress environment, but that maybe have to be idiosyncratically devined -- defined, based on things that have set in. I think most of the time, he would be okay, but not in high-stress situations, for a variety of reasons, this person would not be a good air traffic controller.

Q Right.

A Right. All right. So, has to be relatively calm environment, that can continue on a routine, across that. And those are the most important ones.

Q Okay.

A Now, he has physical effects from neurological issues, and they would have to be taken into account, especially in terms of balance, paresthesias in his limbs. Issues about motor speed and just pure motor speed, not psychological speed, but just plain physical movement, would have to be taken into account.

(R. 677-82.)

Plaintiff's counsel declined to question the ME during the remand hearing.  (R. 682.)

## IV.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions."  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  *Id.* (citation omitted).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).  Assessing and resolving credibility is a matter properly within the purview of the ALJ.  *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

16

Under the Act, disability is defined as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Id.* § 423(d)(3).

## V.    DISCUSSION

Plaintiff raises two issues on appeal: first, that the ALJ "provided an RFC that was not supported by substantial evidence," and second, that the ALJ failed to "address obvious inconsistencies in the vocational testimony."  (Dkt. 20 at 11-12.)  The Court discusses each issue in turn.

## A.    Whether the RFC Is Supported by Substantial Evidence

Plaintiff argues that the RFC was not supported by substantial evidence for the following three reasons: (1) "[t]he ALJ improperly suggested his predetermined results in the case to both the medical and vocational expert prior to taking their testimony on-the-record"; (2) "[t]he ALJ continued to err in evaluating the opinion of Dr. Lamberty"; and (3) "[t]he ALJ failed to address [Plaintiff's] left hand impairment and deficits in standing."  (Dkt. 20 at 12, 16, 23 (some capitalization omitted).)

"A disability claimant has the burden to establish her RFC."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v.*

*Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527). Indeed, "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quoting *Cox*, 495 F.3d at 619-20) (citations omitted).

1.      **ALJ's Suggestion of Predetermined Results**

Plaintiff argues that the ALJ's statements at the remand hearing "illustrated that he emphatically disagreed with the Court's prior remand decision and had predetermined the outcome of the case," and that the ALJ "took issue" with the Court's prior remand decision, "illustrating continued results-oriented decision-making that is at odds with his responsibility to be a nonadversarial adjudicator." (Dkt. 20 at 12-13.) Plaintiff identifies the ALJ's statements to Plaintiff's counsel, the ME, and the VE as the complained-of conduct. (*See id.*) The Commissioner opposes this argument and responds: "The Court

should admonish Plaintiff's counsel for suggesting that the ME and VE would make false statements under oath in order to assist the ALJ in denying this claim." (Dkt. 26 at 6-7.)

As a starting point, "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) (citing *Richardson v. Perales*, 402 U.S. 389, 400-401 (1971)). "[T]he conduct of the [SSA] hearing rests generally in the examiner's discretion. There emerges an emphasis upon the informal rather than the formal." *Richardson*, 402 U.S. at 400. So long as the procedures are "fundamentally fair," SSA hearings "should be understandable to the layman claimant, should not necessarily be stiff and comfortable only for the trained attorney, and should be liberal and not strict in tone and operation." *Id.* at 400-01. With these principles in mind, the Court addresses Plaintiff's three arguments.

First, Plaintiff contends that the ALJ inappropriately "highlighted his disagreement with the Court order" by "implicitly suggest[ing] conclusions to both the [ME and VE]" when the ALJ first stated, "the 2015 . . . neuropsychological examination [was] to some extent the underlying cause of the remand" and went on to state:

> Moreover, the testing certainly showed a decrease in capacity from the—from this claimant's baseline. However, it was still largely within normal limits compared to the general population. Moreover, tons of people with this neuropsychological profile do sustain competitive work albeit, not highly skilled work as an attorney. And that being the case, how is it that the mere fact that someone had a higher level of performance, when reduced to a level of performance and capability that's roughly in line with normal, becomes completely unable to work?

(*Id.* at 12 (quoting R. 670-71).)

Plaintiff first argues the ALJ was wrong to say that the 2015 evaluation was the basis of the remand and wrong to say that the 2015 evaluation results were largely within normal limits.  (Dkt. 20 at 14.)  The Court disagrees.  The remand order addressed the 2015 evaluation when outlining the factual background (*see* R. 755-57), and relied heavily on it in the analysis supporting remand (R. 767-69).  Likewise, the Court finds no error in the statement that the 2015 evaluation results were largely within normal limits, given how many of the results were in the average range (varying from low average to high average ranges).  (*See* R. 382-86.)

Plaintiff next claims that the ALJ's conduct was not that "of a nonadversarial adjudicator" and did not comply with the requirements for proceedings established by the Supreme Court.  (*Id.* (citing *Sims*, 530 U.S. at 110-11).)

The Court has carefully reviewed the transcript and disagrees with Plaintiff's characterization of the ALJ's conduct.  The ALJ began by inviting Plaintiff's counsel to make an opening statement, and Plaintiff's counsel then made an opening statement that referenced Dr. Lamberty's "three detailed full-scale tests," including the 2015 neuropsychological examination.  (R. 668-70.)  The ALJ then asked Plaintiff's attorney to help him "walk the dog a little bit" as to implications of the 2015 neuropsychological examination, resulting in the following exchange:

> ALJ: . . . The conclusion of the administering neuropsychologist was that claimant would have been unable to perform his past work. Which is a finding utterly consistent with my finding before the remand. Moreover, the testing certainly showed a decrease in capacity from the -- from this claimant's baseline. However, it was still largely within normal limits compared to the general population. Moreover, tons of people with this neuropsychological profile do sustain competitive work albeit, not highly

skilled work as an attorney. And that being the case, how is it that the mere fact that someone had a higher level of performance, when reduced to a level of performance and capability that's roughly in line with normal, becomes completely unable to work?

ATTY: Well, I would say, I don't think it's roughly in line with normal. I still we have the medical expert here today who can talk more about that. But we also –

ALJ: All right and I'm going to ask him to help me with that too. But I want you to help me with it also.

ATTY: Sure. But in terms of this, I think we're dealing with you know, MS is a very complicated disease as I'm sure you know. And so, we have issues, you know, we have areas (INAUDIBLE) and memory that are you know moderate or even high. But then there is the – I note that he's pretty consistently testing quite low in terms of the, in terms of attention and sustainability. He was you know, specifically described as having extremely slow response speed and very significant attention deficit difficulties. And so, in this case, I think, the hard part is it seems like what he needs is a highly structured environment, but one that also allows him to work at a much more variable pace, given his difficulties in term of distracting and sustained tasks, and my understanding you know, and certainly this is also where we have the vocational expert. But my feeling is, most work is one or the other. Most work is either structured or but you know, expects a certain you know, more rigorous pace. Or else it's something that's a little bit more highly skilled, that it gives you more flexibility in terms of your pace. And unfortunately, I think between those kind of two areas, [Plaintiff] is just not capable of sustaining even a simple, unskilled job because he just isn't capable of maintaining on-task behavior that would be required of that kind of job.

ALJ: All right. Thanks, Counsel, for answering my questions. I appreciate it. And so, let me ask you kind of how you want to proceed. Obviously even though, the decision has been remanded, the record is still the record. So, all the testimony given at the past hearing is still part of the record. Do you -- would you like to take some additional testimony from any witness before I turn to Dr. Wargel? Or do you want me to take that testimony and see where it leads? What's your preference? I mean, I'm pretty open to your preference for how you want to conduct testimony today.

(R. 670-72.)

Based on the transcript, this Court finds that the ALJ listened to Plaintiff's opening statement, openly expressed his concerns in view of the 2015 neuropsychological exam and the remand order, invited Plaintiff's counsel to "help" him with it, listened to the response, and then asked Plaintiff's counsel how he wished to proceed because he was "pretty open" to counsel's preference.  Nothing about this suggests the ALJ asked the question about the 2015 neuropsychological exam to signal to the ME and VE that he intended to deny all or part of Plaintiff's claim and induce them to give him answers that would support that outcome.  The ALJ's questions appeared sincere and as though he genuinely wanted help resolving the evidence with the remand order, as well as make Plaintiff's counsel aware of his concerns.

Plaintiff's attorney responded to the ALJ's inquiry as to how he wished to proceed by suggesting they begin with the ME's testimony and then "if we have additional areas to fill in afterwards, I would certainly be willing to do it that way."  (R. 672-73.)  The ALJ then responded with "[s]ure," and then noting new evidence showing "even further decline" in Plaintiff's neuropsychological testing by stating, "there's that issue out there too," before concluding: "So, here's what I propose.  Let's see if [the ME] can't make the dumb Judge smart.  And then depending on how that testimony goes, I'll let you kind of drive the train after that in terms of what you think might be necessary."  (R. 673.)  Nothing about the ALJ's description of the new evidence (in a manner favorable to Plaintiff), or his self-deprecating statement regarding his desire to be educated by the ME, suggests to the Court that the ALJ was acting in an adversarial manner or trying to influence the ME's testimony.

Second, Plaintiff argues that the ALJ "interrupted [Plaintiff]'s representative's cross examination to essentially cross-examine the representative instead while simultaneously continuing to suggest conclusions to this witness," including "at a point where the VE testimony was faltering regarding how the performance of a job like 'marker' is consistent with [the ME's] testimony that [Plaintiff] would need to avoid situations where he would have to organize as he went."  (Dkt. 20 at 14-15 (citing R. 696-97).)  Plaintiff specifically challenges the ALJ's reliance on his understanding of the merchandise marker job and statement that "in the real-world context there are people with these neuropsychological findings doing these types of jobs and we both know it."  (*Id.* at 15 (citing R. 699-700).)

The transcript shows that Plaintiff's counsel examined the VE about the ability of a person to walk around when working the merchandise marker, collator operator, and router jobs; pace and quotas; attaining precise set limits and tolerances and standards; and employer tolerance for errors.  (R. 691-96.)  Plaintiff's counsel then suggested:

> like the marker, I mean they're having to do -- every time they're placing the name tags, they're having to identify a different product and place it you know a specific name tag on the back. They're not just doing the same – you know, they're having to make an assessment each time, comparing the product to the description of the price tag, would that be fair to say?

(R. 696-97.)

The VE responded: "Not every time. Now sometimes, when I've observed the job, sometimes I've seen them just putting a rings [sic] on.  And doing nothing else."  (R. 697.)  It was at this point that the ALJ interjected "Counselor, are you alleging that the record supports that your client would be unable to differentiate between chicken noodle

soup and tomato soup" and "you're making it seem like these are rocket science decisions, when really you're like, it's like, put the meat sticker on the meat and put the soup sticker on the soup." (R. 697.) Plaintiff's counsel then argued that the merchandise marker job was "almost exactly" like the Wisconsin Card Sorting Test, which the ALJ disagreed with because "what you do is you do it on a batch," and further described his view of the process. (R. 697-98.) At the end of the ALJ's description (which included a direction for the VE to correct the ALJ if he was wrong), the VE interjected "That's exactly it," and then said "Sorry" for interrupting the ALJ. (R. 698.)

Next, Plaintiff's counsel and the ALJ engaged in a spirited discussion about the merchandise marker job, during which the ALJ said "I mean you can ask [the VE] about that" before describing his experience working in retail and grocery stores, and then stating, "I would defer to [the VE] on what that is . . . again, I'd defer to [the VE]." (R. 699-700.) The ALJ did say "there's got to be like kind of some commonsense element to questioning here," to which the attorney responded "that's exactly, I think that's exactly what I'm trying, I mean, we[']re talking about commonsense in a setting where we're talking about a highly structured environment, where there is no production pace." (R. 699.) But ultimately, the ALJ stated that he would defer to the VE as to the merchandise marker job, told Plaintiff's counsel that he could ask the VE further about the merchandise marker job, and did not preclude Plaintiff's counsel from further questioning. (R. 699-700.) The ALJ clearly did not agree with Plaintiff's argument as to the merchandise marker job. (R. 699-700.) But as to this disagreement's effect on the VE's testimony, the VE disagreed with Plaintiff's counsel's description of the

24

merchandise marker job **before** the ALJ interjected his "soup" question and before this spirited exchange (R. 697), and the VE also agreed with the ALJ's description of the merchandise marker job **before** this spirited exchange (R. 698). Finally, Plaintiff's counsel declined to ask any questions of the VE after this exchange, instead transitioning to a closing argument. (R. 700-01.) There is no indication that the ALJ's interjections changed the VE's testimony, and the ALJ did not preclude Plaintiff's counsel from asking questions to support his arguments as to what the merchandise marker job entails. The ALJ's conduct during examination of the VE is not a basis for remand or reversal.

Third, Plaintiff alleges that the ALJ and the ME had an improper off-the-record conversation prior to the remand hearing, perhaps by way of a "separate phone call entirely, rather than one occurring just prior to the hearing." (Dkt. 20 at 15-16 & n.16.) This is based, first, on the following question from the ALJ:

> Q Okay. Now, let's get to -- before we talk about -- so, now we're – let's address the period of time that you've just discussed first. And then we'll talk about whether or not we needed to get into the discussion before that time. Because I had a hunch you might say something like that. So, from 8/27/20 forward, in other words, from the time we've got the new neuropsychological examinations, from the time we have updated MRI findings that show in fact, progression of the disease, it did -- you implied that you did believe a listing would be met from that time forward. Is that correct?

(R. 675-76.) The ALJ asked this question in response to the ME's testimony about the Listings that "the latter period seems to me to be more serious," specifically noting the August 27, 2020 neuropsychological evaluation correlated with other neurologist records "at the same time" and alternations in the MRI record. (R. 675.)

This allegation is also based on the later statement by the ALJ when transitioning from the post-August 27, 2020 period to the period from the initial alleged onset date in 2015 to the August 2020 period:

> Now, so, let's kind of skip. So, the alleged onset date here is—and I honestly, when—I mean in my re-review of the record, just my initial impressions of the review was that, I didn't fully—**you know, I invited you, Doctor before I read—reviewed the record, to help me understand the initial testing**. Because obviously, the District Court felt like I had a disconnect by seeing the opinions, particularly opinions from neurology as being inconsistent with—that reportedly relied on the 2015 testing, as being inconsistent with that testing. So, but upon my reading of the record, I'm not at all surprised that your testimony about the period from August of 2020, and certainly that made a note to me. But what would your opinion be about the level of severity from the alleged onset date in 2015, you know, through that approximate August time period?

(R. 677 (emphasis added).)

Plaintiff argues that the emphasized sentence, combined with the ALJ's "hunch" that the ME would think the latter period was more serious, violates the prohibition on an ALJ having "substantive contact related to the merits of the case with the ME except at the hearing or in writing, and ensure that any such writing is exhibited." *Testimony of A Medical Expert* HALLEX I-2-6-70(A). The Commissioner counters that here the ALJ was simply "explaining that in the prior decision he had interpreted the findings a certain way, and he desired the ME to explain the objective medical evidence to him so he could make a correct decision on remand," and "[t]here is nothing in the record suggesting an off-the-record conversation between the ALJ and ME as Plaintiff asserts." (Dkt. 26 at 6.)

The Court agrees with the Commissioner. The ALJ's somewhat incomplete questions and comments are indicative of the informality of the proceeding. But having

reviewed the entire transcript, the most natural interpretation of the cited statements is that the ALJ invited the ME to testify at the remand hearing before the ALJ had reviewed the record, not that the ALJ and ME had an improper off-the-record discussion of the case's merits before the hearing. As for the ALJ's "hunch," it is not unusual or improper for a judge to have noted issues during a pre-hearing review that might come up during the hearing or might catch an expert's attention. Plaintiff cites no evidence other than these disjointed statements to support his serious allegation of misconduct. If Plaintiff's counsel—who was the same attorney now representing Plaintiff in this Court—thought the ALJ and ME had engaged in an improper off-the-record conversation about the merits of the case, counsel certainly could have explored that issue during the hearing, including by asking the ME during his testimony. He did not. In sum, the Court rejects Plaintiff's allegation that the ALJ and ME had an improper off-the-record discussion before the remand hearing.

### 2.    Weight Assigned to Dr. Lamberty's 2017 Opinion

Plaintiff argues that the ALJ erred by giving "no weight" to the 2017 opinion of Plaintiff's treating neuropsychologist, Dr. Lamberty. (Dkt. 20 at 17.) Dr. Lamberty performed a neuropsychological evaluation of Plaintiff on March 21, 2017 (R. 518-20) and filled out a Behavioral Functional Ability questionnaire on May 1, 2027 (R. 521-23). The Court addresses both in this analysis.

Plaintiff filed his claim in 2016, so "the rules in § 404.1527 apply." 20 C.F.R. § 404.1520c. "A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).

"For a treating physician's opinion to have controlling weight, it must be supported by medically acceptable laboratory and diagnostic techniques, and it must not be 'inconsistent with the other substantial evidence in [the] case record.'" *Id*. (quoting 20 C.F.R. § 404.1527(d)(2)). "A treating physician's own inconsistency may also undermine [her] opinion and diminish or eliminate the weight given [her] opinions." *Id.* (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)); *see also Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) ("However, '[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'") (quoting *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)). Moreover, "a treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability." *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (quoting 20 C.F.R. §§ 416.927(e)(1), (3)).

### a.    ALJ's Analysis of Dr. Lamberty's 2017 Opinion

The ALJ summarized Dr. Lamberty's March 21, 2017 evaluation in detail, including Plaintiff's self-reports of daily activities, his test scores, and Dr. Lamberty's comparison of Plaintiff's 2017 performance to his 2015 performance. (R. 625-26.)

The ALJ gave "great weight" to Dr. Lamberty's 2017 statement that Plaintiff could not return to his former position as an attorney due to his "information processing speed, poor attention and executive skills," that his performance had declined since

previous testing, and that he would continue to experience further cognitive issues,

finding those opinions "consistent with the record" and "generally accepted." (R. 626.)

The ALJ then addressed Dr. Lamberty's opinions stated in the May 1, 2017

Behavior Functional Ability form:

> However, Dr. Lamberty completed another form indicating the claimant had demonstrated significant declines in cognitive abilities over the previous 18 months, and that give that MS is a progressive disease, these issues would likely continue to worsen over time. She noted the claimant is not currently able to work for any period of time. (Exhibit 9F, p. 6) This statement is conclusory and on an issue reserved to the Commissioner in these proceedings. (20 CFR 404.1527(d)) At that time, Dr. Lamberty had examined the claimant on only two occasions, and her findings were not consistent with a complete inability to work, noting she had indicated generally mild cognitive decline with slow information processing speed and issues with attention, which are fully accommodated in the residual functional capacity above with limitations to simple routine tasks. Therefore, her statement indicating the claimant cannot perform any work is exceedingly restrictive and inconsistent with the evidence, and is given no weight.

> In response to the district court remand in this case, I have further considered the claimant's residual functional capacity in light of Dr. Lamberty's examination findings and opinions, as directed. I called a medical expert, Dr. Wargel, at the hearing on remand, to opine as to the claimant's work-related limitations prior to August 27, 2020, and his findings are largely consistent with the residual functional capacity set forth in the previous decision. Nonetheless, I have added additional restrictions in the residual functional capacity, consistent with Dr. Wargel's medical expert testimony, which further accommodate the claimant's testing findings and cognitive concerns during the relevant time period, prior to August 27, 2020. Specifically, I find the claimant limited as follows, to accommodate cognitive concerns: the claimant is limited to simple, routine, repetitive tasks at a nonproduction pace (in terms of production pace, I mean a job that is done at a moving line, where the pace of work is controlled completely exclusively to the worker, in other words a moving line, where the rate of work is controlled hour-to-hour and minute-to-minute, so jobs with daily quotas would be fine, where the pace of work could vary throughout the day as long as the daily quotas are met, whereas a job with hour-to-hour or minute-to-minute quotas would not be fine); the tasks should not be variable throughout the day but should be

routine in nature; due to processing speed limitations, the individual would be limited to tasks involving predominantly the taking of directions and not collaborative decision making or making recommendations to customers though he may work in the company of coworkers and the public.

These additional limitations [in the RFC] are consistent with Dr. Wargel's medical expert testimony, which is given great weight, as discussed above. Dr. Wargel reviewed the totality of the evidence submitted on appeal and on remand, and his conclusions are consistent with the medical evidence of record and course of care throughout the relevant time period, including Dr. Lamberty's neuropsychological testing, completed twice, prior to August 27, 2020, discussed in detail above. In light of Dr. Wargel's medical expert testimony, which considers the totality of the evidence, including Dr. Lamberty's testing and the various treatment records by the claimant's treating neurology and other providers during the relevant time period, Dr. Lamberty's opinion as to the claimant being unable to perform any employment prior to August 27, 2020, is given no weight. Not only is her opinion conclusory and on an issue reserved to the Commissioner, it is not supported by her own examination findings, nor the claimant's ongoing functioning during this time period. As noted, the claimant described complete independence with activities of daily living, and reported participating in activities such as household maintenance and repair projects, driving, cooking, and shopping (using the self-checkout and his credit card), without difficulty, despite his neurocognitive profile and findings. (Exhibits 5F, 9F) Dr. Lamberty does not appear to have considered the claimant's ongoing functioning in providing her opinion as to the claimant's inability to work. Further, there is no evidence Dr. Lamberty had the opportunity to review the claimant's other treatment records, including those by Dr. Shahkhan, which reflect generally intact mentation throughout this time period. Dr. Lamberty's findings are not supported by medically acceptable clinical and laboratory diagnostic techniques.

While she did complete neuropsychological testing with the claimant and the claimant's diagnosis of MS is confirmed with MRIs during the relevant time period and subsequently, the results of the testing do not support the degree of limitation indicated by Dr. Lamberty as discussed above. While her testing results do support *some* limitations, these are fully accommodated in the residual functional capacity, above, which contains significant limitations and would preclude performance of the claimant's previous work as an attorney. However, her findings do not preclude the performance of work as described in the residual functional capacity above, as they establish decline in cognitive functioning, but not at a level of limitation that would preclude all work activity. Instead, her testing findings are consistent with the

limitations set forth above, as supported by Dr. Wargel's medical expert testimony. Further, Dr. Lamberty's conclusions are inconsistent with other substantial evidence in record, including Dr. Shahkhan's exam findings with the claimant, establishing intact mentation, and the claimant's own report of intact and independent activities of daily living, as discussed above. Therefore, Dr. Lamberty's testimony [sic] is not entitled to controlling weight, and is instead given no weight, as it is not supported by the evidence of record.

(R. 627-28.)

With this in mind, the Court turns to the parties' arguments as to the weight given Dr. Lamberty's 2017 opinion.

### b.    Dr. Lamberty Is a Treating Source

The Court addresses the threshold matter of whether Dr. Lamberty is a treating source under the regulations.  The Commissioner argues that she is not.  (Dkt. 26 at 8.) According to the Commissioner, because Dr. Lamberty administered tests to Plaintiff only twice during the relevant period —once in September 2015 and again in March 2017—she does not qualify as a treating source.  (*Id.*)  This argument is unpersuasive. The SSA regulations define a treating source as:

your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

20 C.F.R. § 404.1527.  Although Dr. Lamberty administered tests to Plaintiff only a few times—in 2015, 2017, and 2020—the record shows that her infrequent evaluations are part of Plaintiff's regular or typical treatment for MS because such evaluations are done when there are concerns about progression of the disease, but not more regularly.  (R. 407.)  When describing the reason for referral in 2015, Dr. Lamberty stated that Plaintiff was referred "to assess concerns regarding memory in the context of a diagnosis" of MS. (R. 407.)  Plaintiff had been similarly evaluated in 2012 after a relapse of the disease.  (R. 407.)

The Commissioner cites two cases *Hunter v. Astrue*, No. 085245, 2009 WL 3242021 (D. Minn. Oct. 2, 2009), and *Branson v. Callahan*, 14 F. Supp. 2d 1089 (N.D. Iowa 1998), to support the proposition that a doctor does not "qualify as a treating physician simply because Plaintiff labels him or her as such."  (Dkt. 26 at 8.)  As Plaintiff explains in his reply, however, these cases are "readily distinguishable" from the facts here.  (Dkt. 27 at 5-6.)  The doctor in *Hunter*, Dr. Karayusuf, was a psychiatric consultative examiner who evaluated Hunter once during the relevant 5-year period, due to symptoms of substance abuse, substance withdrawal, and possible depression.  2009 WL 3242021, at *2-6.  Based on symptoms for these and other alleged physical and mental injuries and disorders, Hunter saw a high number of treatment providers during the 5-year period.  *Id*.  It was one of these one-time providers who ordered Hunter to undergo the psychiatric evaluation conducted by Dr. Karayusuf.  *Id*.  Moreover, in his capacity as a one-time consultative psychiatrist, Dr. Karayusuf has been recognized in other cases in this District as a consulting examiner, not a treating source.  *See Kuppich v.*

*Berryhill,* No. CV 16-2545 (BRT), 2017 WL 4083147, at *5 (D. Minn. Sept. 14, 2017) ("Dr. Karayusuf is a consulting examiner, not a treating source, which means that his opinion deserves 'no special weight.'").

The *Branson* court focused on the SSA regulation that "[the SSA] may consider a physician who has treated you only a few times. . . to be your treating source if the nature and frequency of the treatment is typical for your conditions(s)." 14 F. Supp. 2d at 1098 (quoting 20 C.F.R. § 1527). Branson sought treatment for degenerative disc disease from the doctor at issue twice over two years. *Id*. The *Branson* court found that the doctor was not a treating physician because two visits in over two years was "inconsistent with the type of treatment and evaluation required for the supposedly intense pain suffered by plaintiff from the degenerative disc." *Id*.

Unlike in *Hunter*, Plaintiff here has a clear diagnosis of MS which involves an established course of treatment from his treating sources, and Dr. Lamberty is not a recognized consultative examiner. And unlike in *Branson*, Plaintiff's recurring and remitting MS requires that he be evaluated when he has symptoms that show potential progression of the disease. As Plaintiff argues, Dr. Lamberty is a specialist in neuropsychological assessment who "performed medical evidence reviews followed by lengthy full-scale neuropsychological testing in order to assess cognitive changes over time due to MS, giving her a longitudinal understanding of his symptom progression." (Dkt. 27 at 7.) And this testing is not performed on a regular basis not just because it may not be needed, but as Plaintiff points out and as consultative examiner Dr. Schuler

noted, it also **cannot** be performed on a regular basis due to "a resultant 'practice effect.'" [6]  (*Id*. at 7 (citing R. 464)).

Finally, the ALJ referred to Dr. Lamberty as a "treating" or "examining source" and the prior District Court order also considered Dr. Lamberty a treating source.  (R. 604, 764-772.)  The Court finds these facts persuasive as to Dr. Lamberty's treating source status.

In sum, the Court finds that Dr. Lamberty is a treating source within the meaning of the applicable SSA regulations.

### c.    ALJ's Reliance on the ME's Opinion

Plaintiff first argues that "as this Court noted in the remand order, the contradictory opinion by a non-examining consultant 'does not generally constitute substantial evidence.'"  (Dkt. 20 at 19 (citing R. 771 and *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000)).)  However, "[i]t is well settled that an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment."  *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir. 2004) (citing *Freeman v. Apfel,* 208 F.3d 687, 692 (8th Cir. 2000) and 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)).

Here, the ALJ relied on Plaintiff's activities of daily living, Dr. Shahkhan's records "which reflect generally intact mentation throughout this time period," Dr. Lamberty's

---

[6]    "Practice effects, [are] defined as improvements in cognitive test performance due to repeated exposure to the test materials."  https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC1847360/#:~:text=Practice%20effects%2C%20defined%20as%20improvements,vie wed%20as%20sources%20of%20error (last visited Jan. 31, 2024).

"testing and the various treatment records by the claimant's treating neurology and other providers during the relevant time period" when assigning weight to Dr. Lamberty's opinion. (R. 628.) To the extent Plaintiff argues that the ALJ relied solely on the ME's opinion in violation of the law, the Court rejects this argument. The Court addresses whether substantial evidence supports the weight the ALJ assigned to Dr. Lamberty's 2017 opinion in Section V.A.2.f of this Report and Recommendation, after addressing Plaintiff's more specific arguments.

### d.    Dr. Lamberty's Consideration of Plaintiff's Daily Activities and Other Medical Records

Plaintiff next challenges the ALJ's conclusion that Dr. Lamberty "did not appear to have considered [Plaintiff's] ongoing functioning during the period in question" (Dkt. 20 at 19 (citing R. 628)) and the ALJ's statement that no evidence indicated Dr. Lamberty reviewed other treatment records, including Dr. Shahkhan's (*id.* at 20 (citing R. 628)).

Plaintiff correctly notes that Dr. Lamberty's 2017 examination describes his activities of daily living. (R. 518.) Plaintiff also correctly notes that Dr. Lamberty's 2017 evaluation states she spent 3.58 hours on "records review, neuropsychological assessment, integration and report preparation" and that Dr. Shahkhan signed the 2017 evaluation. (R. 520.) This prompts Plaintiff to state that "[f]alsehoods cannot serve as substantial evidence." (Dkt. 20 at 19.)

Plainly, falsehoods cannot serve as substantial evidence. But the Court is entirely unpersuaded that either of these misstatements by the ALJ constitute "falsehoods." First, the ALJ expressly noted that Dr. Lamberty was aware of Plaintiff's activities of daily

living, in fact citing Dr. Lamberty's 2017 evaluation (Exhibit 9F) as one exhibit describing those activities. (R. 628 ("As noted, the claimant described complete independence with activities of daily living, and reported participating in activities such as household maintenance and repair projects, driving, cooking, and shopping (using the self-checkout and his credit card), without difficulty, despite his neurocognitive profile and findings. (Exhibits 5F, 9F)").) The ALJ's statement that "Dr. Lamberty does not appear to have considered the claimant's ongoing functioning in providing her opinion as to the claimant's inability to work" (R. 628) reflects his belief that there was a disconnect between Dr. Lamberty's 2017 opinion and her own description of Plaintiff's activities of daily living. The Court finds no "falsehood" in the ALJ's statement.

As for Dr. Lamberty's review of other medical records, the ALJ did incorrectly state that Dr. Lamberty did not appear to have reviewed other medical records. (R. 628; *see also* Dkt. 26 at 14 n.1 (Commissioner acknowledging the error but asserting only records Dr. Lamberty appeared to have reviewed were Dr. Shahkhan's).) Plaintiff responds by citing a line in Dr. Lamberty's September 22, 2015 evaluation indicating she reviewed results from Noran Neurological Clinic. (Dkt. 27 at 9-10.)

Plainly, the ALJ was mistaken as to the records. Plaintiff goes too far, however, in describing what appears to be a simple error as a "falsehood." Plaintiff's reliance on Dr. Lamberty's 2015 evaluation referencing records from Noran does not demonstrate an intentional misstatement as to Dr. Lamberty's 2017 evaluation, given that most of Dr. Shahkhan's records reflecting intact mentation post-dated the 2015 evaluation. More importantly, Plaintiff has not identified any aspect of Dr. Lamberty's 2017 opinion where

36

she relies on her review of other medical records (instead of the testing she conducted) in forming her opinions or explains why she may be discounting those other medical records. The ALJ cannot address how Dr. Lamberty viewed other medical records when nothing in her 2017 opinions is based on or otherwise discusses those records, and Plaintiff has not explained why the ALJ's error matters. The Court finds that the ALJ's error in this regard does not require remand or reversal.

### e.    ALJ's Treatment of Dr. Lamberty's Statement that Plaintiff Was Not Currently Able to Work for Any Period of Time

Plaintiff suggests that the ALJ discounted Dr. Lamberty's statement that Plaintiff was "not currently able to work for any period of time" and did not "address the specific moderate, marked, and extreme limitations provided by Dr. Lamberty at all, much less in any detail." (Dkt. 20 at 21.) It is blackletter law that "a treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability." *Davidson*, 578 F.3d at 842 (quoting 20 C.F.R. §§ 416.927(e)(1), (3)). The ALJ correctly gave the statement that Plaintiff was "not currently able to work for any period of time" no weight.

Plaintiff's argument that the ALJ did not address Dr. Lamberty's limitations set forth on the May 1, 2017 questionnaire is unpersuasive. The ALJ described Dr. Lamberty as indicating on the same questionnaire that Plaintiff had "demonstrated significant declines in cognitive abilities over the previous 18 months," which she expected to get worse, and described her as providing "conclusions" and a "degree of

limitation." (R. 628.) The Court understands this to refer to Dr. Lamberty's assignment

of moderate, marked, and extreme limitations. (*See* R. 521-23.) The Court finds that the

ALJ considered Dr. Lamberty's specific opinions as to Plaintiff's behavioral functional

capabilities when making his determination.

###### f. Respective Weight Assigned to Dr. Lamberty's and the ME's Opinions

The remainder of Plaintiff's argument as to his cognitive limitations contrasts the

ME's and Dr. Lamberty's opinions and argues that the ALJ should have credited Dr.

Lamberty over the ME. (*See* Dkt. 20 at 21-22.)

The ALJ discounted Dr. Lamberty's 2017 opinions as follows:

> While her testing results do support *some* limitations, these are fully
> accommodated in the residual functional capacity, above, which contains
> significant limitations and would preclude performance of the claimant's
> previous work as an attorney. However, her findings do not preclude the
> performance of work as described in the residual functional capacity above,
> as they establish decline in cognitive functioning, but not at a level of
> limitation that would preclude all work activity. Instead, her testing findings
> are consistent with the limitations set forth above, as supported by Dr.
> Wargel's medical expert testimony. Further, Dr. Lamberty's conclusions are
> inconsistent with other substantial evidence in record, including Dr.
> Shahkhan's exam findings with the claimant, establishing intact mentation,
> and the claimant's own report of intact and independent activities of daily
> living, as discussed above. Therefore, Dr. Lamberty's testimony is not
> entitled to controlling weight, and is instead given no weight, as it is not
> supported by the evidence of record.

(R. 628.)

Plaintiff does not dispute the ALJ's description of Plaintiff's activities of daily

living as "intact and independent," Dr. Lamberty's test results, or Dr. Shahkhan's exam

findings.  Instead, Plaintiff argues that the ALJ did not address the factors in § 404.1527.

(Dkt. 27 at 7-9.)  The Court disagrees.

The § 404.1527(c) factors include examining relationship, treating relationship,

length of the treatment relationship and the frequency of examination, nature and extent of

the treatment relationship, supportability, consistency, specialization, and "the amount of

understanding of our disability programs and their evidentiary requirements that a medical

source has . . . and the extent to which a medical source is familiar with the other

information in your case record."  20 C.F.R. § 1527(c).  Here, the ALJ acknowledged Dr.

Lamberty's status as a treating and examining provider.  (R. 604; *see also* R. 627 (noting

that Dr. Lamberty examined Plaintiff and made findings).)  Next, consistent with

§ 404.1527(c)(2)(i), the ALJ considered the frequency of Dr. Lamberty's examinations of

Plaintiff.  (R. 627 ("At that time, Dr. Lamberty had examined the claimant on only two

occasions.").)  Then, as required by § 404.1527(c)(4), the ALJ considered the consistency

of Dr. Lamberty's examinations with the record as a whole, finding some of her opinions

consistent with the record and others inconsistent, and explaining his rationale.  (R. 627

("As with the previous statement indicating the claimant could not perform work as an

attorney, this statement is consistent with the record, generally accepted, and given great

weight."; "Therefore, her statement indicating the claimant cannot perform any work is

exceedingly restrictive and inconsistent with the evidence, and is given no weight.").)

Consistent with the "controlling weight" guidance set forth in § 404.1527(c)(2), the ALJ

explained that he found "Dr. Lamberty's findings are not supported by medically

acceptable clinical and laboratory diagnostic techniques."  (R. 627.)  Finally, the ALJ

expressly cited § 404.1527(d) when rejecting Dr. Lamberty's opinion as to Plaintiff's ability to work.  (R. 627.)  While the ALJ did not provide a list of the § 404.1527 factors in his opinion or specifically cite every factor, his analysis comports with the requirements of that regulation. *See McGinnis v. Chater*, 74 F.3d 873, 875 (8th Cir. 1996) ("An arguable deficiency in opinion-writing technique is not a sufficient reason for setting aside an administrative finding where. . . the deficiency probably ha[s] no practical effect on the outcome of the case.") (quoting *Benskin v. Bowen*, 830 F.2d 878, 883 (8th Cir. 1987)).

Plaintiff argues that it is "entirely opaque as to how [the ME's] opinion was more reliable than Dr. Lamberty's concerning the very same testing she undertook."  (Dkt. 20 at 19.)  The Court disagrees.  The ALJ acknowledged that Dr. Lamberty's 2017 testing supported "some limitations," but in view of Plaintiff's "intact and independent" activities of daily living (including household maintenance and repair, shopping, driving, and cooking), the fact that Dr. Schuler's 2016 and Dr. Lamberty's 2017 test results were predominantly in the low average or average range (if not higher) (R. 610-11, 613, 623, 626) and their independent assessments of Plaintiff with "mild" neurocognitive disorder in 2016 (Dr. Schuler) and 2017 (Dr. Lamberty) (R. 624, 627), and Dr. Shahkhan's findings of intact mentation (R. 628), concluded that "[Dr. Lamberty's] findings do not preclude the performance of work as described in the residual functional capacity above, as they establish decline in cognitive functioning, but not at a level of limitation that would preclude all work activity" (R. 628).  As for the ME, the ALJ gave his testimony "great weight" because the ME "reviewed the entirety of the medical evidence before me

on appeal," the ME supported his testimony with references to the record, and the ALJ found his testimony "consistent with a thorough consideration of that evidence." (R. 617, 628.)

Plaintiff has not identified any error in the ALJ's description of Dr. Shahkhan's findings or Dr. Schuler's 2016 and Dr. Lamberty's 2017 test results. Plaintiff also acknowledges that the ALJ may consider activities of daily living. (Dkt. 27 at 10 ("Defendant also sets up a strawman argument, asserting that "Plaintiff's assertion that the ALJ cannot rely on his activities is contrary to the relevant law." (Def. Br. At 17). Of course, Plaintiff made no such assertion.").) And as explained above, the ALJ's error as to whether Dr. Lamberty reviewed other medical records in 2017 does not affect the analysis, as there is no indication Dr. Lamberty took any other medical records into account when reporting her test results or forming her opinions, and Plaintiff has not identified what in those other medical records would have changed the result.[7] Given the role of this Court when reviewing the ALJ's decision is "limited and deferential," *Chismarich*, 888 F.3d at 980, and because "a reasonable mind could accept the . . . [ALJ's] decision," *Cuthrell v. Astrue*, 702 F.3d 1114, 1116 (8th Cir. 2013), the Court finds that the weight the ALJ assigned to Dr. Lamberty's and the ME's opinion is supported by substantial evidence.

One other point. Plaintiff repeatedly suggests that the ALJ disagreed with and disregarded the remand order, and consequently acted improperly before and during the

---

[7] Indeed, Plaintiff has not explained why this error matters, other than apparently for purposes of bolstering Plaintiff's accusation that the ALJ acted improperly.

remand hearing, including by trying to influence the VE's and ME's testimony during that hearing.  (Dkt. 20 at 12-16, 22; Dkt. 27 at 5.)  The Court has already explained why it finds Plaintiff's assertions of impropriety as to the hearing without merit.  As to the ALJ's compliance with the remand order, having carefully reviewed the record, the Court sees no evidence that the ALJ disregarded the remand order, either as to his decision on remand or his consideration of the medical evidence.  As to the ALJ's decision, the remand order "expressed no opinion as to the ultimate determination of whether Mr. B is or should be found to be disabled."  (R. 772.)

As to consideration of the evidence, the ALJ heard testimony from the ME, and then was frank that he believed Plaintiff was disabled as of the August 15, 2020 date, but "need [Plaintiff's attorney] to help [the ALJ] out more" to find Plaintiff disabled before that date.  (R. 683-84.)  He invited Plaintiff's counsel to proceed how he thought best in view of his current inclination.  (R. 684.)  There is nothing improper about this conduct, and nothing in the transcript indicates any disrespect towards Plaintiff or his attorney. The ALJ's order sufficiently explained why he gave weight to certain aspects of Dr. Lamberty's opinions but not others, including considering the consistency with the record.  There is nothing about the ALJ's treatment of the remand order that demonstrates a disregard for the order or undermines the fact that substantial evidence supports the weight assigned to Dr. Lamberty's 2017 opinion.

For all these reasons, the Court finds the RFC's limitations as to mental and cognitive abilities is supported by substantial evidence.

### 3. Plaintiff's Left Hand and Leg Impairments

First, Plaintiff argues that the ALJ "failed to include any limitations upon the basis of [Plaintiff's] left hand, pain, and fatigue." (Dkt. 20 at 23.) Plaintiff points to evidence in the record "as early as August of 2013" which documents "relative difficulty with the left hand." (*Id.* at 24 (citing R. 90, 117 (Plaintiff's testimony during April 2, 2019 hearing); R. 307 (left hand numbness observed by Dr. Lamberty in 2015); R. 313 (Social Security field officer interviewer's observation that Plaintiff's "writing was not neat" and observed difficulty using "hand(s)"); R. 581 (September 6, 2013 neurology consultation report).) Plaintiff suggests that the ALJ used the fact that he was not diagnosed with carpal tunnel syndrome until 2022 to include no limitations as to his hands. (*Id.* at 23-24).

Second, Plaintiff argues that the ALJ failed to make a credibility determination as to his left hand and leg symptoms:

> In order to find that [Plaintiff] is not disabled it must be shown that he is capable of performing work activities on a regular and continuing basis (eight hours a day, five days a week). *Meyer v. Astrue*, No. CIV. 09-3205 MJD/LIB, 2011 WL 495637, at *13 (D. Minn. Jan. 18, 2011). "This requires that an ALJ take into account 'an individual's own description of [his] limitations.'" *Id.* quoting *McGeorge v. Barnhart,* 321 F.3d 766, 768 (8th Cir.2003). An ALJ may reject [Plaintiff's] subjective allegations but in order to do so the ALJ "must make an express credibility determination detailing the reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factors." *Burress v. Apfel*, 141 F.3d 875, 880-81 (8th Cir. 1998) quoting *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir.1998). These factors include: the claimant's daily activities; the duration, frequency and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

(*Id.* at 23.)  According to Plaintiff, "[t]he ALJ provides little to no discernible analysis of these factors as relates to these issues."  (*Id.*)

Third, Plaintiff argues that the ALJ "rejected [Plaintiff's restrictions in standing based upon his observation that [Plaintiff] walked several miles each day."  (*Id.* at 25.) Plaintiff argues, "while it is true that [Plaintiff] does a significant amount of walking, this is not necessarily compatible with full-time light work because he would struggle to stay at his workstation."  (Dkt. 20 at 30-31.)  According to Plaintiff, based on the VE's testimony "an individual who left his workstation for more than 6 to 10 minutes per hour would not be employable," and as this was not addressed by the ALJ, remand is appropriate.  (*Id.* at 30 (citing R. 692).)

The Commissioner responds that the ALJ correctly rejected Plaintiff's 2022 diagnosis of carpal tunnel syndrome as outside the relevant period, but did consider Plaintiff's symptoms as to his left hand and legs.  (Dkt. 26 at 18-21.)  The Commissioner relies on Plaintiff's travel to Singapore and Myanmar, other vacation travel, activities of daily living, Dr. Shahkhan's objective testing in January 2016 and reports that medication improved Plaintiff's symptoms, and Dr. Lamberty's observations in 2017.  (*Id.* at 19-20.) As to the VE's testimony, the Commissioner argues:

> [T]he VE testified that in addition to the usual breaks during the day and the need to perform some walking away from the workstation to retrieve necessary items and supplies while performing work tasks, the identified jobs would also allow the worker to be off-task 6 to 10 minutes per hour if they needed to simply walk away. Thus, even if Plaintiff needed to take a walk to relieve any discomfort, he would not be precluded from performing the VE-identified jobs.

(*Id.* at 20-21.)

In his reply, Plaintiff argues that the Commissioner is relying on grounds not articulated in the ALJ's opinion.  (Dkt. 27 at 12-13.)

First, the Court is not persuaded by Plaintiff's argument that the ALJ used the timing of his carpal tunnel diagnosis to ignore all of his left-hand symptoms.  (*See* Dkt. 20 at 23-24.)  At the beginning of the opinion, the ALJ noted Plaintiff's testimony: "He indicated he has clumsiness with his left hand."  (R. 616.)  And, as explained below, the ALJ noted Plaintiff's reports of numbness and tingling in his hands and findings of intention tremor on finger-to-nose testing.  The ALJ's decision not to rely on Plaintiff's carpal tunnel diagnosis in 2022 for purposes of the RFC does not indicate the ALJ ignored Plaintiff's left-hand issues.

As to Plaintiff's left leg, the ALJ also noted at the outset: "He also reported fatigue in the left leg" and his spouse's testimony that Plaintiff "has difficulty with his legs, with pain and fatigue, particularly worsening in early 2017," "cannot sit still and cannot sit on the sideline for their kids' games for longer than 15 minutes," and "walks a lot, but that he is very slow, stumbles, meanders, and has fallen at times."  (R. 616.)

The Court next addresses Plaintiff's argument that the ALJ did not make a credibility determination as to his left hand and leg symptoms.  The ALJ explained that the RFC:

> Accommodate[d] the claimant's various impairments to the extent the weight of the objective medical findings of record support limitations at all. Specifically, the claimant is limited to light work, with climbing, postural, and environmental restrictions, to accommodate the claimant's course of care and objective findings in terms of neurological findings pertaining to multiple sclerosis and cervical degenerative disc disease, during the relevant time period.

(R. 617.)  He further stated "the claimant's physical functioning, though indicating some impairment in gait, does not establish a limitation to sedentary work, as discussed in detail below."  (R. 618.)

Throughout the ALJ's analysis "below," he described Plaintiff's physical reports and examination findings, including reports of left-side numbness and tingling in November 2014 (Dr. Beattie) and a finding of mild intention tremor with coordination testing on finger-to-nose testing in January 2016 (Dr. Shahkhan).  (R. 620-21.)  The ALJ also discussed the results of functional testing in April 2016 in some detail.  (R. 622.)  He explained he gave the results little weight—even though they were not inconsistent with the light RFC assigned to Plaintiff.  (R. 622.)  He further stated:

> However, the limitation to occasional time on feet in this report is not at all supported by the record, particularly given that, well after the report was completed, the claimant reported walking three to eight miles per day. (Exhibit 6F, p. 2) The claimant's ability to walk diminished subsequently, after March 2017, but still did not diminish such that he could not perform light work as defined in terms of time on feet. Overall, the functional testing is not consistent with what the claimant's physical capabilities were at the time it was written. Accordingly, it is given little weight.

(R. 622.)

The ALJ next described Plaintiff's physical reports and findings to Dr. Shahkhan in August 2016 (including mild intention tremor on finger-to-nose coordination testing) and addressed Plaintiff's physical therapy in fall 2016.  (R. 625.)  As described by the ALJ:

> [T]he claimant reported his only physical limitation as his gait pattern with Trendelenburg gait and toe drag, especially with ascending and descending stairs. He noted he was participating, at the time, in daily walking for five to six miles per day. (Exhibit 6F, p. 2) He also reported having been gone for

several weeks on a fishing trip and a trip to Kentucky, while staying consistent with his home exercise program. (Exhibit 6F, p. 9) He reported attending his daughters' hockey practices and games, and working to come up with creative ideas to exercise his left lower extremity during these times. (Exhibit 6F, p. 21) The physical therapy notes indicated the claimant demonstrated an improvement with his overall gait, with better step length though some gait deficits which he was better able to manage when aware. (Exhibit 6F, pp. 30, 36) The claimant's performance in physical therapy is consistent with the ability to perform work within the light residual functional capacity above, with no use of an assistive device mentioned in the treatment notes during this time period.

(R. 625.)

The ALJ then described Plaintiff's physical reports to and examination findings made by Dr. Lamberty in 2017; primary care notes from early 2017 and March 2018; and physical reports to and findings made by Dr. Shahkhan in April 2017, March 2018, September 2018, December 2018, June 2019, and January 2020. (R. 628-30.) No party disputes the ALJ's description of these reports and findings, and the Court need not repeat them here except to note the ALJ acknowledged issues with gait, mild intention tremor on finger-to-nose coordination testing, sway on Romberg[8], and difficulty with tandem walking, but also noted no reports of falls, normal muscle tone, bulk, and strength. (R. 628-30.)

The ALJ then addressed Dr. Shahkhan's April 2019 opinion that:

[He] had noted left-sided deficits consistent with the diagnosis of MS, specifically, muscle weakness, muscle fatigue, and loss of coordination in

---

[8]    The Romberg test is "a diagnostic, non-technical, physical test that identifies a specific neurologic impairment." https://www.ncbi.nlm.nih.gov/books/NBK563187/ (last visited Jan. 31, 2024). The purpose of the test "is to identify a particular impairment in patients with specific proprioception difficulties for purposes of intervention and improving patient outcomes." *Id*. "Proprioception is the sense of awareness of the position and movement of the body." *Id*.

the upper and lower extremities. He indicated that since May 1, 2017, in his opinion, the claimant did not have the functional capacity to reliably perform the tasks required in the occupations of hand trimmer, stuffer, and deburrer, eight hours per day, five days per week. He indicated he felt the claimant would require accommodations, such as extra breaks, to continuously stay on task at even simple, unskilled work for entire eight-hour workdays. He noted that if the claimant attempted even simple, repetitive, unskilled work, he would require extra breaks every 30-45 minutes.

(R. 631.)

The ALJ rejected this opinion due to Dr. Shahkhan's lack of vocational expertise and because "examination findings with the claimant, discussed above, were largely unchanged from previous, and did not support a finding of a need for unscheduled breaks as described in the form," Plaintiff "did not report a decline in activities of daily living or household tasks at this time," and Plaintiff "continued to have only routine and conservative management of MS, with medication management, and being seen only once every six months or so, consistent with stable disease." (R. 631-32.)

As to physical restrictions, the ALJ concluded with:

Overall the objective findings do not support a conclusion that the claimant would be further limited than the light residual functional capacity above for any 12-month period of time from the alleged onset date, through August 26, 2020.

As noted above, though the claimant has physically declined during the relevant time period, he had not declined so much that he was restricted to sedentary work at any time prior to August 27, 2020. Specifically, in March 2017, the claimant reported walking several miles each day and being very active. In 2018, he developed a slight limp that worsened by late 2018. However, he had good strength findings generally, and his gait was noted as only a "slight" limp. This finding does not support a further restriction to sedentary work.

(R. 632.)

The ALJ also considered Plaintiff's spouse's testimony from the first hearing, but found that "[t]o the extent her testimony would support additional restrictions, however, it is not consistent with the evidence as a whole, including the physical examination findings and course of care discussed above." (R. 633; *see also* R. 616 (description of spouse's testimony).)

In sum, the ALJ was aware of Plaintiff's symptoms and complaints as to his left hand, left leg, and ability to stand. "When examining a claimant's subjective complaints, in addition to objective medical evidence and the claimant's prior employment record, an ALJ must also examine: (1) 'the claimant's daily activities'; (2) 'the duration, frequency and intensity of the pain'; (3) 'precipitating and aggravating factors'; (4) 'dosage, effectiveness and side effects of medication'; and (5) 'functional restrictions.'" *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) (quoting *Polaski,* 739 F.2d at 1322). As described in detail above, the ALJ addressed Plaintiff's objective medical evidence, daily activities, Plaintiff's functional restrictions, and his reports to providers as to his left hand and leg symptoms. The ALJ also discussed Plaintiff's medication, which Dr. Shahkhan noted kept Plaintiff's MS "under control." (R. 625; *see also* R. 449 (August 31, 2016 chart note).) The ALJ considered Plaintiff's "routine and conservative management of MS, with medication management, and being seen only once every six months or so, [as] consistent with stable disease." (R. 632.) The ALJ properly considered Plaintiff's treatment regimen when assessing Plaintiff's subjective complaints. *See Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996) (stating that a claimant's "lack of treatment," if found

inconsistent with the claimant's subjective complaints, is one factor the AJL may consider when discounting such subjective complaints).

Finally, the ALJ also considered Plaintiff's employment record, stating that his "competitive full time employment" was "to his credit" but that it "does not support a finding of disability absent objective evidence of disabling symptoms and limitations." (R. 633.)  In sum, "[a]lthough the ALJ did not go through a step-by-step [*Polaski*] factors analysis, he did discuss the facts relevant to a proper inquiry into each of the factors." *Perkins*, 648 F.3d at 900.  The Court finds the ALJ made a credibility determination as to Plaintiff's left hand and leg symptoms and that his determination is supported by substantial evidence.

The Court turns to Plaintiff's third argument that while he "does a lot of walking," this "is not necessarily compatible with full-time light work because he would struggle to stay at his workstation" due to fatigue and pain in his legs.  (Dkt. 20 at 25-26.)  Plaintiff argues that the ALJ did not address this issue at all.  (*Id.* at 26.)  On the contrary, the ALJ considered Plaintiff's subjective complaints as to pain and fatigue, including those made during the remand hearing, and made a credibility finding that his statements "concerning the intensity, persistence and limiting effects of these symptoms are not fully supported prior to the established onset date."  (R. 616-17.)  As explained above, the weight the ALJ assigned to Plaintiff's subjective complaints is supported by substantial evidence.

Further, as to a worker's ability to leave their work station and walk around, the VE testified that based on his experience: "there's going to be an allowance for up to typically two 15-minute breaks and a 30 to 60-minute meal break."  (R. 692.)  "And then

on top of that, an allowance for up to 15 percent of the day off task maximum. But in increments of at most 6 to 10 minutes an hour." (R. 692.) Plaintiff appears to be arguing that the typical breaks plus being "off task" for walking around 6 to 10 minutes an hour is not sufficient to address his subjective complaints as to standing. (*See* Dkt. 20 at 26.) But Plaintiff identifies no evidence, and only makes attorney argument, that the breaks and "off task" time that the VE testified would be permissible for the jobs at issue would render those jobs unavailable for Plaintiff. The Court will not disturb the ALJ's finding as to the weight assigned to Plaintiff's subjective complaints by importing a limitation as to "walking around" time that is not supported by any evidence.

For these reasons, the Court finds that the ALJ addressed the credibility of Plaintiff's left hand and leg symptoms and that the weight the ALJ assigned those symptoms supported by substantial evidence. The Court therefore finds that the physical limitations in the RFC are supported by substantial evidence.

**B.    Whether Inconsistencies Exist Between Plaintiff's Limitations and the Jobs Provided by the VE**

Plaintiff argues that the restrictions identified by the ME "were at clear odds with the jobs identified by the vocational witness." (Dkt. 20 at 27.) This argument focuses on the following testimony from the ME as to Plaintiff's "psychological/cognitive limitations:"

- "He has a problem with organization, especially in a disorganized environment. And so, he would need a structured environment."

- Plaintiff "[s]hould avoid complex decision-making."

- "He shouldn't be interacting with [others[ [sic] to reach a particular product" or "be trying to persuade the public to do anything."

- "A non-timed setting would be best… variable of capacity across a half day or a full day."

- "The other kind of situation that would be particularly destructive would be if he had to organize as he went… structured, relatively clear, no reliance on him to organize things."

- "A low-stress environment, but that maybe have to be idiosyncratically defined."

(R. 679-81.)

Plaintiff argues that the jobs provided by the VE were "grossly at odds with" these restrictions identified by the ME, "illustrating that they were either not adequately accounted for in the RFC or were misunderstood by the VE." (Dkt. 20 at 27-28.) Moreover, Plaintiff argues that the merchandise marker, collator operator, and router jobs identified by the VE "do not align with the restrictions testified to by" the ME. (Dkt. 20 at 28 (citing R. 690).)

Plaintiff is attempting to substitute attorney argument for evidence. The hypothetical provided by the ALJ included the limitations of the RFC, and no more. (R. 680-90.) The VE testified that the merchandise marker, collator operator, and router jobs would be available to someone with those limitations. (R. 689-91.) To the extent Plaintiff argues that the merchandise marker job is not available to him due to its organizational requirements, the VE rejected Plaintiff's counsel's characterization of that job and agreed with the ALJ's description. (R. 696-98.) Plaintiff's counsel chose not to pursue the issue further. (R. 700.) "The Commissioner may rely on a vocational expert's

response to a properly formulated hypothetical question to show that jobs that a person with the claimant's RFC can perform exist in significant numbers." *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005). To the extent Plaintiff makes arguments about what his testing shows as to time to complete tasks and executive functioning (*see* Dkt. 20 at 29-30), it is the limitations in the RFC that guide the analysis, not individual test results from the record, *see Cox*, 495 F.3d at 617 (step five requires determination of whether "there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience"). Attorney argument and allegations of inconsistencies unsupported by evidence and inconsistent with the law do not provide a basis for reversal. The Court finds the ALJ's step five determination is supported by substantial evidence and is not contrary to law.

* * *

For the reasons stated above, the Court recommends that Plaintiff's request for reversal or remand of the Commissioner's decision be denied and the Commissioner's request that the Court affirm the Commissioner's decision be granted.

## VI.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 20) be **DENIED**; and

2.    The Commissioner's request that the Court affirm the Commissioner's decision (Dkt. 25) be **GRANTED**.

DATED:  January 31, 2024                    *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).